# 14-2641-CR(L)
## 14-4425-CR(CON)

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤◄◄

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

FAHD HUSSAIN, AKA Ali, AKA Moe, TAMESHWAR SINGH,
AKA Sealed Defendant 5, SHEA DOUGLAS, JERMAINE DORE,
AKA St. Kitts, AKA Blaqs, TAIJAY TODD, AKA Sealed Defendant 4, AKA Biggs,

*Defendants,*

*and*

DWAYNE BARRETT, AKA Sealed Defendant 3, AKA Tall Man,
DAMIAN CUNNINGHAM, AKA Jaba,

*Defendants-Appellants.*

_____

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF FOR DEFENDANT-APPELLANT
## DWAYNE BARRETT, AKA SEALED DEFENDANT 3,
## AKA TALL MAN

KELLEY J. SHARKEY, ESQ.
*Attorneys for Defendant-Appellant
  Dwayne Barrett, AKA Sealed Defendant 3,
  AKA Tall Man*
26 Court Street, Suite 2805
Brooklyn, New York 11242
718-858-8843

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

PRELIMINARY STATEMENT ...............................................................1

JURISDICTIONAL STATEMENT ..........................................................1

QUESTIONS PRESENTED ......................................................................2

STATEMENT OF THE CASE..................................................................2

STATEMENT OF FACTS .........................................................................3

    A.  INTRODUCTION..................................................................3

    B.  THE INDICTMENT ...............................................................3

    C.  THE PRE-TRIAL HEARING.................................................5

    D.  MOTIONS IN LIMINE ........................................................10

    E.  THE TRIAL ..........................................................................11

II.  THE GOVERNMENT'S CASE AT TRIAL....................................11

III.  THE DEFENSE CASE AT TRIAL...................................................16

    F.  THE VERDICT AND SENTENCE .......................................16

ARGUMENT ............................................................................................20

    Point I

    THE DISTRICT COURT ERRED BY FAILING TO SUPPRESS
      BARRETT'S CELLPHONE, WHICH WAS SEARCHED
      WITHOUT A WARRANT OR CONSENT, AND WAS
      SEIZED WITHOUT PROBABLE CAUSE. .............................20

Point II

THE DISTRICT COURT ERRED WHEN IT ALLOWED THE
    JURY TO VIEW AN INFLAMATORY, PREJUDICIAL
    VIDEO THAT HAD NO PROBATIVE VALUE AND
    THAT VIOLATED BARRETT'S FIRST AMENDMENT
    RIGHTS. ...................................................................................29

Point III

THE DISTRICT COURT ERRED IN RULING THAT A
    CONSECUTIVE SENTENCE WITH A MANDATORY
    MINIMUM WAS REQUIRED, WHEN THE PLAIN
    LANGUAGE OF 18 U.S.C. §§ 924(j) AND 924(c)
    INDICATES CLEARLY THAT NO SUCH
    REQUIREMENT EXISTS. ...................................................38

Point IV

BARRETT JOINS THE ARGUMENTS OF HIS
    CO-APPELLANT TO THE EXTENT THEY
    ARE CONSISTENT WITH THE ARGUMENTS
    RAISED HEREIN AND ARE BENEFICIAL
    TO HIM...............................................................................46

CONCLUSION ...........................................................................47

CERTIFICATE OF COMPLIANCE.............................................48

ii

# TABLE OF AUTHORITIES

**Page**

**Cases**

Cameron v. City of New York,
  598 F.3d 50 (2d Cir. 2010)................................................................35

Chapman v. California,
  386 U.S. 18 (1967), quoting Fahy v. Connecticut,
  375 U.S. 85 (1963)............................................................................27

Consumer Prod. Safety Comm'n v. GTE Sylvania,
  447 U.S. 102 (1980)..........................................................................38

Dunaway v. New York,
  442 U.S. 200 (1979)..........................................................................25

Florida v. Jimeno,
  500 U.S. 248 (1991)..........................................................................24

Old Chief v. United States,
  519 U.S. 172 (1997)..........................................................................32

Riley v. California,
  134 S.Ct. 2473 (2014) .......................................................................19

Rubin v. United States,
  449 U.S. 424 (1981)..........................................................................39

Schneckloth v. Bustamonte,
  412 U.S. 218 (1973)..........................................................................20

Snyder v. Phelps,
  131 S. Ct. 1207 (2011) ......................................................................34

State v. Skinner,
  218 N.J. 496, 95 A.3d 236 (2014)......................................................34

Street v. New York,
394 U.S. 576 (1969) ..........................................................................34

TRW Inc. v. Andrews,
54 U.S. 19 (2001) ...........................................................................41

United States v. Allen,
247 F.3d 741 (8th Cir. 2001)............................................................39

United States v. Arango–Correa,
851 F.2d 54 (2d Cir.1988)................................................................21

United States v. Berrios,
676 F.3d 118 (3d Cir. 2012)..............................................................39

United States v. Buschel,
594 F.Supp. 942 (N.D.N.Y. 1984) ....................................................25

United States v. Cassesse,
685 F.3d 186 (2d Cir.2012)...............................................................37

United States v. Castillo,
530 U.S. 120 (2000) ........................................................................40

United States v. Cavera,
550 F.3d 180 (2d Cir.2008) (en banc), accord United States v.
Broxmeyer, 699 F.3d 265 (2d Cir.2012)...........................................37

United States v. Colon,
880 F.2d 650 (2d Cir. 1989).............................................................33

United States v. Curley,
639 F.3d 50 (2d Cir. 2011).........................................................28, 30

United States v. DeVaughn,
601 F.2d 42 (2d Cir. 1979)...............................................................30

United States v. Dhinsa,
243 F.3d 635 (2d Cir. 2001).............................................................35

iv

United States v. Dorsey
    132 S.Ct. 2321 (2012) ....................................................................42

United States v. Edwards,
    342 F.3d 168 (2d Cir. 2003)............................................................33

United States v. Figueroa,
    618 F.2d 934 (2d Cir. 1980)..........................................28, 29, 30, 33

United States v. Fisher,
    702 F.2d 372 (2d Cir. 1983)............................................................26

United States v. Garcia,
    56 F.3d 418 (2d Cir. 1995)..............................................................22

United States v. Herron,
    2014 WL 1871909 (E.D.N.Y.) .......................................................33

United States v. Ivezaj,
    568 F.3d 88 (2d Cir.2009)...............................................................20

United States v. Julian,
    633 F.3d 1250 (11th Cir.2011)...................................................40, 41

United States v. Kadim,
    718 F.3d 115 (2d Cir. 2013)............................................................33

United States v. McCallum,
    584 F.3d 471 (2d Cir. 2011)................................................32, 33, 35

United States v. McDermott,
    245 F.3d 133 (2d Cir. 2001)............................................................30

United States v. Patrick,
    899 F.2d 169 (2d Cir. 1990)............................................................25

United States v. Pierce,
    2015 WL 2166141 (2d Cir.).............................................................34

United States v. Piervinanzi,
    23 F.3d 670 (2d Cir. 1994)..................................................................38

United States v. Rivera,
    2015 W.L. 1757777 (E.D.N.Y.)........................................................33

United States v. Santos,
    553 U.S. 507 (2008)...........................................................................41

United States v. Siddiqui,
    699 F.2d 690 (2d Cir. 2012)..............................................................30

United States v. Simmons,
    661 F.3d 151 (2d Cir. 2011)..............................................................20

United States v. Snype,
    441 F.3d 119 (2d Cir. 2006)..............................................................20

United States v. Vasquez,
    638 F.2d 507 (2d Cir.1980)...............................................................21

United States v. Wilson,
    11 F.3d 346 (2d Cir.1993)............................................................21, 22

United States v. Young,
    561 Fed. Appx. 85 (2d Cir. 2012).................................16, 37, 39, 40

**Statutes**

18 U.S.C. 3553(a) ...............................................................................42

18 U.S.C. § 924(c) ........................................................................*passim*

18 U.S.C. § 924(c)(1)(A)(ii) ................................................................1

18 U.S.C. § 924(c)(1)(A)(iii) ...............................................................1

18 U.S.C. § 924 (c)(1)(c)(I) ..................................................................1

18 U.S.C. § 924 (c)(1)(c)(2).................................................................1

18 U.S.C. § 924(c)(1)(D)(ii) ...................................................................38, 41

18 U.S.C. § 924(c)(5) ...........................................................................40, 41

18 U.S.C. § 924(c)(5)(B) ...........................................................................40

18 U.S.C. § 924(j) .............................................................................*passim*

18 U.S.C. § 924(j)(1) ..................................................................................1

18 U.S.C. § 924(j)(2)0 .................................................................................1

18 U.S.C. §3231 ...........................................................................................1

18 U.S.C. §3553(a) ...............................................................................17, 43

28 U.S.C. §1291 ...........................................................................................1

Conspiracy to Commit Hobbs Act Robbery (18 U.S.C. §1951) ..............................1

**Rules**

F.R.A.P. 28(i) .............................................................................................44

Fed. R. Evid. 402 ......................................................................................10

Fed. R. Evid. 403 ....................................................................10, 29, 30, 32

Fed. R. Evid. 404(b) ...........................................................10, 30, 33

Fed. R. Evid. 404(b)(1) .............................................................................30

Fed. R. Evid. 404.21 .................................................................................32

**Other Authorities**

Constitution's Ex Post Facto Clause, Art. I, § 9, cl. 3...............................43

Tricia Rose, <u>Black Noise: Rap Music and Black Culture in
    Contemporary America</u> (1994) ......................................................31

Weinstein's Federal Evidence § 403.04 [1]. ...........................................29

## PRELIMINARY STATEMENT

Defendant-appellant, Dwayne Barrett, appeals from a judgment of the United States District Court for the Southern District of New York (Sullivan, J.) convicting him upon a March 19, 2013 jury verdict of the following seven counts of criminal activities:

1) Conspiracy to Commit Hobbs Act Robbery (18 U.S.C. §1951);

2) Carrying and Using a Firearm During and In Relation to a Crime of Violence (18 U.S.C. §924(c)(1)(A)(iii));

3) Robbery (18 U.S.C. §1951);

4) Carrying and Using a Firearm During And In relation To A Crime of Violence (18 U.S.C. §§924(c)(1)(A)(ii), 924 (c)(1)(c)(2);

5) Robbery (18 U.S.C. §1951);

6) Carrying and Using A Firearm During And In Relation To A Crime of Violence (18 U.S.C. §§924(c)(1)(A)(iii), 924 (c)(1)(c)(I);

7) Carrying And Using A Firearm Causing Death (18 U.S.C. §§924(j)(1) and (2)0.

## JURISDICTIONAL STATEMENT

Subject matter jurisdiction in the District Court was based on 18 U.S.C. §3231. This Court has jurisdiction pursuant to 28 U.S.C. §1291. This is an appeal from a final judgment entered on July 28, 2014. Barrett filed a timely notice of appeal. (A. 108).

1

## QUESTIONS PRESENTED

1.     Whether the District Court erred by failing to suppress Barrett's cellphone, which was searched without a warrant or consent, and was seized without probable cause?

2.     Whether the court erred when it allowed the jury to view an inflammatory, prejudicial video that had no probative value and violated Barrett's First Amendment rights?

3.     Whether the District Court erred in ruling that a consecutive sentence with a mandatory minimum was required, when the plain language of 18 U.S.C. §§ 924(j) and 924(c) indicates clearly that no such requirement exists?

4.     Should Barrett be permitted to join in the arguments of his co-defendant to the extent they are consistent with his position and benefit him?

## STATEMENT OF THE CASE

Barrett and four co-defendants were indicted for conspiring to commit robbery, committing a series of robberies, and possessing and using firearms in connection with those crimes.   During one of the robberies a victim was shot and killed.  Barrett and his co-defendant Jermain Dore were tried before Judge Richard J. Sullivan and a jury.   The defendants were convicted on all counts in the

2

indictment after a two week trial, on March 19, 2013. Barrett was sentenced to 90 years in prison on July 16, 2014.

STATEMENT OF FACTS

A.     INTRODUCTION

The Government adduced evidence at trial that Barrett was a member of a violent robbery conspiracy that took place between August 2011 and January 2012. In many of these robberies Barrett and his co-defendant allegedly received information from a store owner, Fahd Hussain, which helped target potential victims. Hussain owned a store on White Plains Road in the Bronx, and through his business operation he possessed information on various local merchants and businessmen. During these robberies one man was killed, another was abducted, and several more were held at gunpoint and assaulted. The Government alleged that Barrett was involved in the robbery of December 12, 2011 but did not directly participate in the shooting and murder of the victim, Gamar Dafalla.

The only witnesses who directly implicated Barrett in the offenses testified pursuant to cooperation agreements negotiated with the prosecution.

B.     THE INDICTMENT

As submitted to the jury, Barrett was charged with seven counts of criminal activity:

3

◦ Count One charged Barrett with conspiring to commit Hobbs Act robberies from in or about 2010 to 2012;

◦ Count Two charged Barrett with using and carrying firearms in furtherance of the conspiracy charged in Count One;

◦ Count Three charged Barrett with committing a Hobbs Act robbery on October 29, 2011 and aiding and abetting the same;

◦ Count Four charged Barrett with using and carrying firearms in furtherance of the robbery charged in Count Three;

◦ Count Five charged Barrett with committing a Hobbs Act robbery on or about December 12, 2012 and aiding and abetting the same;

◦ Count Six charged Barrett with using and carrying firearms in furtherance of the robbery charged in Count Five, which firearms were discharged, and aiding and abetting the same;

◦ Count Seven charged Barrett with carrying firearms in furtherance of the robbery charged in Count Five, and in the course of that crime, causing the death of a person through the use of a firearm, and abetting the same.

4

C.    THE PRE-TRIAL HEARING

On January 9, 2012, Barrett was pulled over by the New York City Police Department ("NYPD") while driving a dark Mercedes Benz that belonged to his girlfriend Felicia Lake.  Barrett was told to step out of the car, his hands were cuffed behind his back, and he was taken to the 47th Precinct for questioning. Barrett's cellphone was seized from the passenger seat of the car, and the police, acting without a warrant, downloaded data from it that was crucial to the prosecution of the case.

On April 23, 2012 Barrett filed a motion to suppress the cell phone and all of the evidence obtained in the unlawful search of the phone, including the cell site information discovered about his phone and phones used by others in the alleged conspiracy.[1]  (Motion and memorandum of law, A. 47-62).  The court conducted a suppression hearing on May 29, 2012, at which the Government called two witnesses, Detective Kruse of the NYPD and Michael Zeppieri of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

Detective Kruse testified that on January 9, 2012, he was investigating a homicide that had occurred on December 12, 2011.  (HTR. 8).[2]  He had learned of a different incident that occurred sometime in mid- November of 2011, in which a

---

[1] The police recovered Barrett's phone number during the search of his phone.  This number was used to connect Barrett's phone, through cell site analysis, to areas close to the vicinity of the locations where crimes charged in the indictment took place.
[2] Numbers preceded by "HTR." refer to the hearing transcript of May 29, 2012.

5

dark Mercedes Benz driven by Barrett had been observed following another car. (HTR. 13). He learned that the Mercedes involved in the mid-November police report belonged to Felicia Lake, Barrett's girlfriend; he did not testify that the Mercedes was linked at that point to any criminal activity. (HTR. 14). Kruse also stated that, according to police reports, on the day of the homicide, the Mercedes was seen on South 4th Street in Mount Vernon, which was in "close proximity" to the homicide, however he did not know how long South 4th Street was, nor what distance "close proximity" referred to. (HTR. 29-31). Kruse testified that he stopped Barrett's vehicle in January of 2012 pursuant to a DD5 that indicated the car should be stopped "for investigative purposes" if police were to come into contact with it. (HTR. 31).

Kruse testified that after stopping Barrett's car, he drew his gun, told Barrett to leave the vehicle, rear-handcuffed and frisked him, and took Barrett to the precinct. (HTR. 16, 17, 21, 32-33). Kruse said his intention was to detain Barrett for questioning (HTR. 32). At the time of the stop Kruse saw a phone on the front passenger seat of the Mercedes. (HTR. 23).

At 12:30 p.m., Barrett was taken to a small interrogation room at the precinct; he was still there at 7:30 p.m. when Kruse departed for the day (HTR. 22-23). Barrett continually indicated that he wanted to leave, and asked when he

was going to be able to do so. (HTR. 20, 40). Kruse testified, "I didn't have a time frame . . . I was trying to get information . . ." He told Barrett that he did not know how long the interrogation would take, but he "appreciated your cooperation if you would help us." (HTR. 20). Kruse admitted that during the 7-hour period in which Barrett was questioned by himself and by other officers he was never given the <u>Miranda</u> warnings. (HTR. 19-20).

As to the cellphone that was on the front passenger seat, Kruse conceded that he seized it without a warrant. (HTR. 23, 34-35). Kruse stated that his "main reason" for taking the phone was to secure it, since the car's windows were down and "people could walk by it." Kruse acknowledged that the car was parked in the police garage, the keys were in the ignition, and he could have secured the phone by rolling up the windows. (HTR. 35-37). He also testified that he retrieved the phone because he thought that if Barrett were going to cooperate with the NYPD, the police would need the phone and cell site information in order to corroborate his story. (HTR. 35-36).

Kruse testified that after Barrett had been in the interrogation room for approximately 6 hours, during which he had questioned him about the homicide, Kruse asked Barret to give him the passcode to his phone, which was locked, so that he could access the information in the phone. According to Kruse, no other

police officers were in the interrogation room with himself and Barrett when, at 6:00 p.m., Barrett told Kruse, "give it to me, I'll unlock it," and proceeded to do so. (HTR. 24, 25, 43). At that point, Barrett received a phone call from Felicia Lake. (HTR. 24-25). After talking on the cellphone, it relocked automatically, and, at Kruse's request, Barrett unlocked it again and gave it to him. (HTR. 25, 43-44).

Kruse testified that, after leaving the interrogation room, he handed the phone over to agent Zeppieri, indicating that Barrett had given his consent to a search the phone. (HTR. 26, 47). Kruse stated that the NYPD "prefers" that officers get written consent before searching a phone, however he never presented the consent form to Barrett and he did not obtain such written consent. (HTR. 44). He said also that he removed the phone from the car on his own initiative, without conferring with the lead detective on the case, Detective Cristfield. (HTR. 46).

Agent Zeppieri testified that when he arrived at the 47th Precinct, NYPD Lieutenant Fitzpatrick told him that Barrett had not consented to search the phone taken from the vehicle. Later, Detective Kruse brought him the phone and said it was unlocked. Zeppieri testified that he "assumed" Barrett had given consent to search the phone. (HTR. 54-55). A few minutes later, Zeppieri asked Kruse "what exactly was said to get consent for the phone." (HTR. 57). Kruse responded that

he asked Barrett for the password, and that Barret would not give it to him, but instead typed in the password, and handed the phone to Kruse. (HTR. 57).

Zeppieri testified that he looked through the phone for 15 minutes, and then gave it to a detective to download its contents. (HTR. 57). Zeppieri stated that he entered the interrogation room, at approximately 8:00 p.m., because "I wanted to get a clear consent to search the phone . . . I wanted to have either a verbal permission to search the phone or written permission . . . " (HTR. 58). He testified that in response to his request for Barrett's consent, Barrett flatly refused and stated "why should I give you permission if I've already given the other officer permission to search the phone?" (HTR. 57-60, 81). Zeppieri also stated that while Barrett was being questioned, he asked if he had any rights and if he could leave the interrogation room; Detective Cristfied told him he could not. (HTR. 61-62, 80). Zeppieri was in the interview room for 15 to 20 minutes. By the time he left the interview room he believed the phone had been completely downloaded (HTR. 60, 62-63). Zeppieri stated that shortly after leaving the interrogation room, he was given a DVD or CD of the phone contents, which he reviewed later. (HTR. 63).

The defense argued that Barrett did not consent to search his phone, and the circumstances surrounding his interrogation made any consent involuntary;

9

alternatively, the search exceeded any consent claimed by the Government and had been retracted.

The District Court denied the motion to suppress, finding that Barrett was frisked, handcuffed, never <u>Mirandized</u> and held at the precinct for over six hours before he consented to the search. While acknowledging that "various factors point in opposite directions as to whether Defendant Barrett gave consent," the District Court held that Barrett's consent "was a product of his free and unconstrained choice." The court credited Detective Kruse's testimony and found that Barrett's argument regarding the scope of the search was rendered moot since Barrett had given consent to Kruse before denying it to Zeppieri. (Order, June 26, 2012, A. 63-67).

D.   <u>MOTIONS IN LIMINE</u>

Prior to trial Barrett moved to preclude the government from introducing a music video that depicted Barrett and two other individuals acting out an armed robbery. The defense moved to preclude the video at trial because it was irrelevant, did not allow for any permissible inference, and was unduly prejudicial, thus violating Rules 402, 404(b) and 403 of the Federal Rules of Evidence.

The Court ruled that the video was relevant to show the association between Barrett and the Mercedes Benz and the connection among the members of the conspiracy. (Order, July 31, 2013, A. 81, 87-90).

E.    THE TRIAL

During the ten day trial the government called more than 40 witnesses to give evidence regarding the robberies that were part of the alleged conspiracy. The evidence included the testimony of law enforcement officers, victims, cooperating witnesses, a ballistics expert, and cell site evidence based on calls made from the defendants' phones. The defendants called one witness to offer a visual aid summarizing and clarifying the cell site data introduced by the Government.

II.    THE GOVERNMENT'S CASE AT TRIAL

During the trial the Government relied extensively on the testimony of two cooperating witnesses, Patrick Taylor and Daniel Brown, to implicate Barrett in the crimes charged in the indictment. They were the only witnesses directly linking Barrett to the various robberies.

ATF Agent John McKenna testified that, at the request of the case agent, he downloaded a video, "The Joy" that was publicly available on the internet. (Tr. 195-196).[3] The video (GX 30) was shown to the jury during the testimony of

_____

[3] Numbers preceded by "Tr." refer to pages of the trial transcript; citations to "GX" are to Government exhibits admitted at trial.

cooperating witness Taylor (Tr. 1064); there was no limiting instruction before or after it was played. Taylor testified that the video portrayed Barrett driving a Mercedes Benz, which Taylor claimed belonged to Barrett. (Tr. 1063-1065). He identified the individual in the front passenger seat as Taijay Todd ("Biggs"), and said that a friend of Biggs, whose name he could not recall, was in the back seat. (Tr. 1065). Although the jury had already seen the video once, the Government played it a second time and asked Taylor whether he saw the guns in the video. He testified that he had not seen those guns before and did not recognize them. (Tr. 1066).

The Government offered cell site evidence to show that Barrett was in the "area" when the robberies occurred. A summary of the evidence allegedly connecting Barrett to a series of seven robberies and attempted robberies, demonstrates the large volume but low quality of the prosecution's proof:

(1) On August 22, 2011, Barrett, Dore, and two others allegedly carried out the robbery of Abdul Rauf, the owner of a gas station and convenience store located in Matamoras, Pennsylvania. They assaulted Rauf and robbed him of approximately $46,000. Rauf was a family friend of Hussain's who had engaged in several cash transactions with Hussain. The robbery occurred on a Monday, the day on which Rauf routinely carried large amounts of cash from his gas station to the bank. At

12

trial, this robbery was described through the testimony of Rauf, Brown and Taylor. Cell site evidence showed that Barrett's phone was in the area at the time of the robbery. (Tr. 545-60(Rauf); Tr. 273-92, 323 (Brown); Tr. 1032-33 (Taylor); GX 3003 (cell site map); GX 73A.))

 (2) On October 29, 2011, Barrett, Dore and Cunningham allegedly robbed Ahmed and Kassim Salahi, two brothers who owned live poultry markets in the Bronx. Dore and Cunningham assaulted Ahmed Salahi outside of a mosque, pushed him into his car, and drove his car to his house. Dore went inside the house and found Kassim Salahi with his two sons. Testimony indicated that Dore asked Barrett to assist him, and Dore and Barrett allegedly brandished guns while searching the house for money. A total of $15,000 was taken. At trial, this robbery was described through the testimony of the Salahi brothers, Taylor and cell site evidence showing that Barrett's phone was in the area at the time of the robbery. (Tr. 572-93 (A. Salahi); Tr. 606-28 (K. Salahi); Tr. 1007-18 (Taylor); GX 3006 (cell site map)).

 (3) On November 14, 2011, Barrett and Dore supposedly followed Jaspal Singh, the manager of two gas stations, as he drove from one gas station to the other, carrying approximately $27,500 in business proceeds. Dore and Barrett were stopped by police officers and released; no criminal activity transpired. At trial,

this attempted robbery was described in the testimony of Singh, New York City Police Department ("NYPD") Officers Carlos Villanueva and Luis Segarra, and Taylor.  (Tr. 70-78) (Singh); Tr. 90-101 (Villanueva); Tr. 125-32 (Segarra); Tr. 1034-36 (Taylor)).

   (4) On December 12, 2011, Dore, Barrett and Todd allegedly robbed three individuals, Jamal Abdulla, Zhao Liang, and Gamar Dafalla, inside a minivan located on South Fourth Avenue in Mount Vernon.  After Dore pointed a gun at the three, Liang and Abdulla got out of the minivan.  Dore and Todd drove away with Dafalla inside the minivan, and Dore shot and killed Dafalla, leaving the vehicle in the Bronx.  At trial, this robbery and murder was described through the testimony of Liang, Abdulla, Brown and Taylor, text messages and phone records between Dore and Brown, video recordings made by nearby surveillance cameras, a license plate reader that captured Barrett's Mercedes near the scene, ballistics evidence, and cell site evidence showing that Barrett's and Dore's phones were near Dafalla's hotel at the time that he checked out of the hotel that morning and that Barrett's, Dore's, and Todd's phones were in the area at the time of the robbery.  (Tr. 1244-59 (Liang); Tr. 1472-2503 (Abdulla); Tr. 326-44 (Brown); Tr. 1058-62 (Taylor); GX 73A (text messages); GX 501, 502, 505 (video); GX 528 (license plate reader);  GX 3008 (cell site map)).

(5) On December 12, 2011, Dore and Barrett allegedly robbed Mohammed Althomory at gunpoint, taking approximately $15,000 in business proceeds from him. At trial, this robbery was described through the testimony of Althomory, text messages between Dore and Brown, and cell site evidence showing that Barrett's and Dore's phones were in the vicinity at the time of the robbery. (Tr. 668-96 (Althomory); GX 73A (text messages); GX 3008 (cell site map)).

(6) On December 31, 2011, Dore, Barrett, Douglas and Taylor allegedly robbed Ayoub Mohammed. After leaving his car, Mohammed was supposedly assaulted by Dore, Douglas and Taylor, who took approximately $3,000 in business proceeds and telephone calling cards worth several hundreds of dollars. At trial, this robbery was described and depicted through the testimony of Mohammed, Taylor, and video recorded by a surveillance camera in the area. (Tr. 880-98 (Mohammad); Tr. 1022-29 (Taylor); GX 1608 (video)).

(7) On January 7, 2012, Dore, Barrett, Douglas, and Brown allegedly robbed Djujka Krco. When she was parking her car, Dore and Douglas assaulted Krco at knifepoint, and took approximately $1,000 in business proceeds as well as other personal items. At trial this robbery was described through the testimony of Krco, Brown, and cell site evidence showing that Dore's phone was in the area at the

15

time of the robbery.  (Tr. 143-53 (Krco); Tr. 292-99 (Brown); GX 3001 (cell site map)).

## III.    THE DEFENSE CASE AT TRIAL

The defense offered visual aids summarizing the cell site data introduced by the Government.  (Tr. 1578-90, 1622-72).  This proof enabled the defense to argue to the jury the vagueness of the term "area" used by the Government's cell site expert.

### F.    THE VERDICT AND SENTENCE

The jury convicted Barrett of all counts in the indictment on March 19, 2013.

The Department of Probation and the defense argued that Barrett's conviction on count 7, which,  pursuant to  18 U.S.C. §924(j), charged a gunpoint robbery at which the victim was shot and killed, was punishable by a sentence with no mandatory minimum and no requirement of consecutive sentences.  (P.S.R.[4] parg. 8, 47, pg 41;  STR. 18-20, A. 109-114).  This position was based upon the plain language of the statute, which lacks any language referencing the necessity of imposing a mandatory minimum or consecutive sentence.  The defense objected to any interpretation of §924(j) that inferred non-existent sentencing requirements.

---

[4] Numbers preceded by "P.S.R." refer to pages of Barrett's Pre- Sentence Report and addendum, which has been sent to the Court under separate cover.

16

The Government conceded that they had previously assumed the lack of an explicit reference to a mandatory minimum or consecutive sentence in §924(j) meant that a District Court could impose any sentence up to life on a conviction under that statute, and had discretion to determine whether such a sentence would be consecutive or concurrent to other terms.   (STR. 20). The Government acknowledged that, based on that assumption, Barrett's co-defendant, Jermain Dore, who had been convicted along with Barrett and sentenced in August of 2013, received a concurrent term pursuant to a violation of §924(j).  However, in this case, the Government took the position that United States v. Young, 561 Fed. Appx. 85 (2d Cir. 2012), a summary order having no precedential effect or authority,  compelled the lower court to impose a consecutive sentence with a minimum term of 25 years.  (STR. 21-22).

The District Court adopted the Government's argument that 18 U.S.C. § 924(j) incorporated §924(c)'s penalty enhancements, specifically, a 25-year minimum for second or subsequent §924(c) convictions and mandatory consecutive sentencing.  The court noted that it had not imposed a consecutive sentence for Dore's conviction on Count 7 even though he, and not Barrett, was the shooter.[5]     Responding to the Government's statement that Barrett played an

---

[5] Dore had been sentenced to 35 years on Count 7 and 20 years on each of Counts 1, 3, and 5, all to be served concurrently.  In addition, he was sentenced to 5 years on count 2 to be served

important role in the robberies, (Str. 26), the lower court highlighted the significant

distinction that Dore had been in the car with the victim of the robbery and Dore

fired the shot that killed him.  The court stated:

> And so Mr. Barrett didn't do that.  . . . felony murder
> would make him as liable and as culpable as the person
> who pulled the trigger, but it's not irrational to say that
> the person pulling the trigger is more culpable than the
> person who is involved in the robbery but did not expect
> or plan for a murder to take place." (STR. 27)**.**

Defense counsel asked the court, in fashioning a sentence that would be

"sufficient, but not greater than necessary," to consider 36-year-old Barrett's

"history and characteristics," as is required by §3553(a). Barrett, who had a

quantifiably low IQ and a learning disability, had been left unsupervised as a child

because his mother worked 3 jobs and his father lived in Jamaica.  The only

potentially stabilizing force in Barrett's life would have been his older sister,

however she moved out of the house when Barrett's mother became romantically

involved with a man who smoked marijuana in the house in front of the children.

Barrett became addicted to marijuana as a young man, dropped out of Mount

Vernon High School in the 10th grade, and became involved with neighborhood

boys who were engaged in criminal activity.  Despite that, as the father of two

---

consecutively, and 25 years on Count 6 to be served consecutively.  His aggregate sentence was
65 years.  (STR. 20, 25; Judgement of Jermaine Dore, A. 92-94).

young children, he was described as a "kind and loving" parent by their mother. (Letter of defense counsel, June 27, 2014, A. 109-114, STR. 23- 26).

On July 16, 2014, the District Court sentenced Barrett to a total of ninety years in prison. He was sentenced to fifteen years on Counts 3 and 5, running concurrently with each other; and to consecutive sentences of twenty years on Count 1, five years on Count 2, twenty-five years on Count 4, and twenty-five years on count 7. The court imposed no sentence on count 6 because it was a lesser included offense of count 7. (STR. 41-43).

ARGUMENT

Point I

THE DISTRICT COURT ERRED BY
FAILING TO SUPPRESS BARRETT'S
CELLPHONE, WHICH WAS SEARCHED
WITHOUT A WARRANT OR CONSENT,
AND WAS SEIZED WITHOUT
PROBABLE CAUSE.

The cell site records, which were obtained as a result of the warrantless, unconsented search of Barrett's cellphone, were crucial to the Government's case: there was no physical evidence connecting Barrett to the robberies, and the only witness testimony was from self-serving Government cooperators. Under the circumstances of this case, in which Officer Kruse forcefully arrested Barrett, questioned him in a small interrogation room for 6 hours, refused to let him leave, never advised him of his right to counsel, and failed to obtain the written consent that is preferred by police department policy, the lower court's ruling that Barrett "voluntarily relinquished" his cellphone was error. Thus, all the evidence the Government obtained as a result of this Constitutional violation should have been suppressed.

The Supreme Court has recently held that a warrant is required before the information contained in a cellphone may be searched, even when the cellphone is recovered incident to an arrest. Riley v. California, 134 S.Ct. 2473 (2014). None

20

of the exceptions cited in that case – the potential that evidence could be imminently destroyed, and physical danger – were present here.

Warrantless searches are presumed to be unreasonable, however an exception may exist if it is established that an individual voluntarily gave permission for the search. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Since there was no warrant here, the Government argues as its only resort that Barrett consented to the search of his cellphone. "[W]hen, as in this case, the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary." United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006). On an appeal from a District Court's ruling on a motion to suppress evidence, this Court reviews the lower court's factual findings for clear error, viewing the evidence in the light most favorable to the government, United States v. Simmons, 661 F.3d 151 (2d Cir. 2011), and reviews the court's legal conclusions *de novo*. United States v. Ivezaj, 568 F.3d 88, 96 (2d Cir.2009). Under these standards, this Court should reverse the District Court's ruling.

In this case, Barrett did not freely and voluntarily consent to relinquish all of the information and data in his phone, and Kruse's claim otherwise was not credible. Even if Barrett did eventually agree to type in the password, the coercive

circumstances under which that occurred rendered his action involuntary. Furthermore, if he consented by unlocking the phone, that consent was limited, and was clearly retracted afterward when he spoke to Zeppieri.

More than "mere acquiescence in a show of authority" is necessary to establish the voluntariness of a consent.   United States v. Wilson, 11 F.3d 346, 351 (2d Cir.1993).  Rather,  "[c]onsent must be a product of that individual's free and unconstrained choice, see United States v. Arango–Correa, 851 F.2d 54, 57 (2d Cir.1988);   United States v. Vasquez, 638 F.2d 507, 524 (2d Cir.1980).  In this case, there was an abundant demonstration of overbearing police authority.  Upon stopping the Mercedes, Kruse approached the car with his gun drawn, handcuffed Barrett from behind, and escorted him to a small interrogation room where he was questioned for more than 6 hours by numerous police officers before the conversation about the cellphone occurred.  The police further asserted their power over Barrett when, in response to his repeated entreaties to leave or to at least be told when the police intended to release him, Kruse said there was "no time frame," but we "appreciated your cooperation if you would help us." Any person in such circumstances would understand that he was being detained indefinitely, or until he gave the police what they wanted.  Clearly, the District Court's reliance on the fact that the police offered Barrett something to eat and drink over the total 10-

hour period in detention, and tried to accommodate his child care issue, was misplaced (Order, p. 4); the police were simply taking care of his basic needs so that he would eventually cooperate with them. "Consent" under such conditions is no more than acquiescence to authority, and should not be credited.

Furthermore, while knowledge of the right to refuse consent is not a requirement to a finding of voluntariness, it has been deemed a factor in ascertaining whether consent was coerced. United States v. Garcia, 56 F.3d 418, 422-423 (2d Cir. 1995). Here, the Government's witnesses never informed Barrett that he had a right to refuse to have his phone searched. Barrett was never presented with the NYPD's cellphone consent form, which presumably would have presented consent as an option. In addition, Barrett was never Mirandized and thus was not told that he had a right to consult a lawyer before speaking to the police. In a similar situation, this Court stated that the defendant's "limited education . . . coupled with the fact that he was not informed of his right to refuse consent to the search, cause us to doubt whether [he] actually consented to this search, particularly in light of the intrusive nature of the agents' [actions]." United States v. Wilson, 11 F.3d 346, 351 (2d Cir.1993) (consent issue was moot because introduction of the handgun was harmless error). In sum, the circumstances under

which Barrett was arrested and detained demonstrate that he did not relinquish his cellphone voluntarily.

Furthermore, Kruse was not credible. Since no other officers were present during the segment of the 6-hour interrogation in which Barrett gave verbal "consent," and there was neither written consent nor a videotape of the conversation, it was crucial to the Government that Kruse's testimony be entirely reliable. That he lacked credibility was first demonstrated when he tried to explain why he took the phone from the car without a warrant. Even though the car was parked in the police garage, Kruse thought someone might walk by and take the phone. Despite that fear, he did not close the windows and lock the car, even though the keys were in the ignition. He gave a second explanation for retrieving the phone, which was that he could use the data to corroborate Barrett's story if Barrett chose to cooperate. That rationale was plainly facetious, since there was no indication whatsoever that Barrett was going to cooperate, and, had he decided to do so, Barrett would have signed the Department's written consent form. Rather, Kruse's real motivation in seizing the phone was to obtain its data quickly, without a warrant.

Kruse's testimony is also suspect because he chose not to follow the Department's policy preference, which is that officers obtain written consent, and

24

never explained why he failed to do so.  Significantly, Zeppieri was so concerned about whether he could rely on Kruse's representation that Barrett had consented, that he undertook to obtain consent himself.   This Court should be equally concerned that the verbal "consent" did not exist or was not adequate.

Furthermore, even if Barrett gave consent to a cellphone search, it was clear that he intended to limit its scope.   Kruse repeatedly asked for Barrett's passcode, but Barrett never gave it to him; instead he typed it into the phone without disclosing it.  Since Kruse testified that the phone re-locked automatically after Barrett received a phone call from his girlfriend, the phone must have been set to re-lock, either after a certain time period or event, such as a phone call.   Thus, by typing in his passcode rather than revealing it, Barrett limited his consent.  The Supreme Court has acknowledged that "[a] suspect may of course . . . delimit as he chooses the scope of the search to which he consents."  <u>Florida</u> v. <u>Jimeno</u>, 500 U.S. 248, 252 (1991) (finding no Fourth Amendment violation).  The Court explained that the method for measuring the scope of a suspect's consent is to examine what the typical person would have understood by the exchange between the suspect and the police.  <u>Id</u>. at 251.   By consistently refusing to reveal his passcode – and thus give unfettered access to the phone – Barrett was clearly trying to limit his consent.

At the exact moment at which Zeppieri was in the interrogation room asking Barrett if he would consent to the search of his cellphone, the phone's data was being downloaded. Directly after this conversation, in which Barrett explicitly refused to consent, Zeppieri was handed a media file with the phone's contents. Barrett had not voluntarily consented to Kruse's unfettered search, and had likewise denied permission to Zeppieri. Without either consent or a warrant, the media file, which at that point had not been reviewed, should have been destroyed.

Furthermore, since Barrett's arrest lacked probable cause, the cellphone seizure that flowed from it was unlawful. Dunaway v. New York, 442 U.S. 200 (1979). The Mercedes first came to police attention when it was seen following another car. At that point, there was no evidence whatsoever of alleged criminal intent; it may have been following the other car for completely benign reasons. Near the time of the homicide, the Mercedes was seen in Mount Vernon, a densely populated, urban area. Although Kruse testified that the Mercedes had been observed on South 4th Street, and was said to have been in "close proximity" to the homicide, he conceded that he did not know the length of the street and had no idea what "close proximity" meant. Thus, the Mercedes could have been within one block or one mile of the homicide. Despite the fact that he lacked probable cause, Kruse forcibly detained Barrett, seized his phone, and interrogated him from 12:30

p.m. until 10:00 p.m. based on a DD5 that authorized an investigative stop only.[6] Under these circumstances, which amounted to an arrest, the phone and the information obtained from it should have been suppressed. United States v. Patrick, 899 F.2d 169 (2d Cir. 1990) (suppressing statements made as result of illegal and coercive arrest); United States v. Buschel, 594 F.Supp. 942 (N.D.N.Y. 1984) (physical evidence suppressed where there was no probable cause even though there may have been strong reasons for suspicion); United States v. Fisher, 702 F.2d 372 (2d Cir. 1983) (suppressing identification where police had a reasonably articulable suspicion to question, but no probable cause to arrest).

In its decision, the lower court acknowledged that the determination it had to make was far from clear cut when it stated that "various factors point in opposite directions." (Order, A. 65). Barrett respectfully argues that the lower court struggled to reconcile its doubts over whether he had relinquished his cellphone freely and voluntarily because the Government failed to satisfy its burden of proof. Thus the phone and all of the information that was discovered through it should have been suppressed.

This error cannot be deemed harmless. There was no physical evidence whatsoever linking Barrett to the robberies. The only witness testimony came

---

[6] See DD5, which states that states Barrett was sought as a "suspect only- no probable cause to arrest." (Exhibit #1 to Barrett's pro se supplemental brief, A. 115).

from two Government cooperators who were facing extensive incarceration for their role in the robberies. One of them, Patrick Taylor, admitted to having made hundreds of large drug sales (Tr. 1071), used other people's identities, and perhaps most revealing, to having lied to federal authorities on many different topics (Tr. 1105-1109). Without the cell phone data, the Government's case against Barrett would have been insubstantial at best.

The Supreme Court has stated that in order to determine that a particular error was harmless when that error involves a Constitutional violation, as it does here, the Court must be satisfied that there was no "reasonable possibility that the evidence complained of might have contributed to the conviction," Chapman v. California, 386 U.S. 18, 23 (1967) (quoting Fahy v. Connecticut, 375 U.S. 85 (1963), and that the error was harmless beyond a reasonable doubt. Id. at 24. Here, the seizure of the cellphone and the information taken from it – a clear violation of Barrett's Fourth Amendment rights – was critical to the conviction. Therefore, this Court should rule that the District Court erred when it did not suppress it.

Point II

THE DISTRICT COURT ERRED WHEN
IT ALLOWED THE JURY TO VIEW AN
INFLAMATORY, PREJUDICIAL VIDEO
THAT HAD NO PROBATIVE VALUE
AND THAT VIOLATED BARRETT'S
FIRST AMENDMENT RIGHTS.

Over Barrett's objection, the Government introduced a video that showed

Barrett and others acting out a fictional armed robbery, using masks and guns,

while a popular rap song played in the background. The video, which had been

posted on the internet as a form of entertainment, was prejudicial because of the

high probability that the jury would misconstrue it as a demonstration of Barrett's

propensity to commit the crimes charged. Such a video could only taint the jury's

view of Barrett, inducing them to believe that he was a morally repugnant

individual. A district court's evidentiary rulings are subject to review for abuse of

discretion, United States v. Curley, 639 F.3d 50 (2d Cir. 2011); under that

standard, this Court should find that the boundaries set out in the rules of evidence

prohibited the lower court from allowing the jury to view this video.

In weighing the admissibility of potentially inflammatory evidence against a

defendant, a trial judge is required to consider the risk of unfair prejudice and to

balance that risk against probative value. United States v. Figueroa, 618 F.2d 934,

943 (2d Cir. 1980). Clearly, all material evidence introduced against a defendant

29

tends to prove guilt, however evidence becomes prejudicial when it has an adverse effect upon a defendant beyond proving the fact that justified its admission. Prejudice may be created by the tendency of the evidence to prove some adverse fact that is not at issue, or to "unfairly excite emotions against the defendant," arouse the jurors' sense of horror, or provoke an instinct to punish. Figueroa, 618 F.2d at 943; Weinstein's Federal Evidence § 403.04 [1].

Here, the video was undoubtedly prejudicial. It showed Barrett effecting a performance of virtually the exact criminal activity he was charged with, inevitably conveying to the jurors that he had a propensity to commit those crimes. There was a clear danger that the jury would conflate the story told in the video with the actual robberies with which Barrett was charged, and meld the lawbreaker-character he played in the video with the real person on trial.[7] Insofar as the jury was likely to consider the fictionalized video to be evidence of how Barrett would go about committing a robbery and use it as concrete proof that he had committed robbery, rather than focus on the actual evidence, its admission was a clear violation of the Federal Rules of Evidence Rule 403, which bars evidence if its

---

[7] This Court does not have to speculate over whether the jury would have been likely to view the video as propensity evidence, since there is direct proof that they did so. After trial, a juror told defense counsel, in sum and substance, "[W]hile I knew it was just a video and not a real robbery, it showed us what the defendants were capable of." The juror also informed defense counsel that the jury played the video during deliberations. (Affidavit of Kevin C. Murphy, A. 68-70).

probative value is outweighed by unfair prejudice, or the danger that it will confuse the issues or mislead the jury, as happened here. This Court has stated that, in reviewing a Rule 403 ruling, the Court should maximize the evidence's probative value while minimizing its prejudicial effect. See United States v. McDermott, 245 F.3d 133, 140 (2d Cir. 2001). Here, the video's minimal probative value was decisively outweighed by unfair prejudice and its misleading, confusing impact on the jury.

Rule 404(b)'s analysis of "bad act" evidence applies here, since the video portrayed a bad act that appeared to be real.[8] Under that Rule, such acts "cannot be used to prove that a defendant . . . has a criminal nature or propensity and the acts in question are consistent with his nature or tendency towards crime." United States v. Siddiqui, 699 F.2d 690, 702 (2d Cir. 2012). See Curley, 639 F.3d at 56 (2d Cir. 2011) ("other act" evidence serves proper purpose so long as it is not offered to show the defendant's propensity to commit the offense); United States v. Figueroa, 618 F.2d 934 (2d Cir. 1980) (reversed where prior crime evidence improperly admitted); United States v. DeVaughn, 601 F.2d 42, 45 (2d Cir. 1979) (reversed when court admitted evidence of subsequent heroin possession).

---

[8] The District Court ruled, without explanation, that it was "not apparent" that Fed. R. Evid. 404(b)(1) applied at all. (A. 88).

The District Court mistakenly limited its consideration of prejudice to the sole question of whether the video contained explicit violence, finding that it was "not unduly prejudicial, as it doesn't have any graphic portrayals of violence and features far less violence than is routinely shown on television." (A. 87). Apart from the fact that the court's assessment of prejudice failed to consider propensity, its unduly narrow view that, without gruesome details, the video was not prejudicial was patently incorrect: the film, with its cool, calm dramatization of a robbery, acted out to a rap song called "The Joy," was shocking, chilling, and repugnant. Flowing from the genre of "gangsta rap," which has been described as " . . . a boastful, bragging form of . . . storytelling, sometimes explicitly political and offensively aggressive, violent and sexist in content," Tricia Rose, Black Noise: Rap Music and Black Culture in Contemporary America (1994), at p. 55, this video was an intentionally inflammatory, repulsive, and provocative work of fiction, which was clearly prejudicial.

Furthermore, the lower court erred in adopting the Government's argument that the video was relevant to issues that were contested at trial. At the Government's urging, the court admitted the video for the purpose of demonstrating a connection among the members of the conspiracy and an association between Barrett and the Mercedes Benz that was allegedly driven to

32

many of the robbery locations. (A. 88). The video showed Taijay Todd in the front passenger seat of the Benz, and another individual, whose name Taylor forgot and who was not charged in the indictment, in the rear of the car. However, it was never at issue that Barrett knew Todd: in his opening statement, defense counsel stated that Barrett did not deny knowing people charged in the conspiracy, " . . . including a fellow named Taijay Todd in the video." (Tr. 65-66)[9]. As to the car, Barrett never disputed the testimony by Government informant Brown and others that the Mercedes belonged to his girlfriend and that he routinely drove it. (Tr. 288, 311, 340-341; A. 71-79). Thus, the issues for which the video was admitted were uncontested.

In United States v. McCallum, 584 F.3d 471 (2d Cir. 2011), this Court found that the lower court had abused its discretion by admitting prior crimes evidence that, while not conceded, was not seriously in dispute. Calling the evidence "unnecessary" to the case, this Court quoted Rule 404.21:

> [T]he availability of other, less prejudicial, evidence on the same point ordinarily reduces the probative value of a given item of extrinsic evidence . . . If the incremental value is slight, and the possibility of prejudice through misuse by the jury great, the court should exclude the evidence under Rule 403 (emphasis added).

---

[9] Todd was charged in the indictment and pled guilty prior to the trial.

33

In this case, because the facts that the Government sought to prove through the video were cumulative, redundant, irrelevant to any disputed or consequential issue, and totally unnecessary to the Government's case, the lower court abused its discretion by admitting the video.  A court errs when it admits "other act" evidence that has a high possibility of jury misuse and only slightly more probative value than other evidence on the same issue.  See Old Chief v. United States,  519 U.S. 172, 185 (1997) ("[t]he probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point");  McCallum, 584 F.3d at 477;  United States v. Colon,  880 F.2d 650, 660 (2d Cir. 1989) (a court should not allow Government's evidence of intent unless it is clearly relevant to a contested issue);  Figueroa, 618 F.2d at 939 (court should determine whether an issue is "really in dispute" before admitting evidence under Rule 404(b)).   Here, the video, which was irrelevant to any issue actually in dispute, was comparable to the "propensity evidence in sheep's clothing" that was condemned in McCallum, 584 F.3d at 477, and should not have been admitted.

Furthermore, the lower court should have cautioned the jury that they were not to consider the video for any improper purpose.  In this Circuit, "other act" evidence may be admissible only when specific stringent criteria are followed, including an appropriate limiting instruction.  United States v. Kadim, 718 F.3d

34

115, 123 (2d Cir. 2013); United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003). Following that rule, in setting out procedures for the possible admission of rap videos, District Courts in this Circuit have anticipated the necessity of such instructions. See United States v. Rivera, 2015 W.L. 1757777 (E.D.N.Y.); United States v. Herron, 2014 WL 1871909 (E.D.N.Y.).

Finally, the video was an artistic expression entitled to protection under the First Amendment, and this Court would be remiss were it to view the question of its admission solely as an evidentiary issue. Courts should not "sustain a conviction that may have rested on a form of expression, however distasteful, which the Constitution tolerates and protects." Street v. New York, 394 U.S. 576, 594 (1969). Regardless of whether one finds the video effective as art or commentary, there can be no doubt that its fictional portrayal of urban life was intended as social commentary, and that, as such, it should be given special Constitutional protection. Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011).

Barrett respectfully argues that this Court's recent decision in United States v. Pierce, 2015 WL 2166141 (2d Cir.), which allowed the admission of a rap video because the speech itself was not proscribed conduct, should not govern its decision here. In Pierce, the defendant appeared to use coded language as a message, which the Government's cooperating witness deciphered for the jury. In

35

contrast, the video in this case was an artificial enactment of a robbery, and as such, is a simple artistic work.  In State v. Skinner, 218 N.J. 496, 521, 95 A.3d 236 (2014), the New Jersey Supreme Court overturned a conviction where the government's case at trial relied heavily on violent rap lyrics, observing that the lyrics were artistic, and not literal, in intent:  the court observed that "[o]ne would not presume that Bob Marley, who wrote the well-known song 'I Shot the Sheriff,' actually shot a sheriff." 218 N.J. 496, 521, 95 A.3d 236 (2014).  In this case as well, the video falls under the ambit of the First Amendment and should not have been admitted.

This error was not harmless.  The Government's case against Barrett rested on the circumstantial evidence of cell site records, which purported to show that his cellphone was in the vicinity of the robberies near the time they took place, and the testimony of cooperating Government witnesses whose credibility was at issue. In that context, it is clear that the inflammatory video, which was played twice during trial, described by Taylor, and played again during deliberations, (A. 69, ¶ 11) had a significant effect on the jury.  Where legal error is found, it is deemed harmless only when courts "possess a sure conviction that the error did not prejudice the defendant."  United States v. Dhinsa, 243 F.3d 635, 649 (2d Cir. 2001).  Erroneously admitted evidence may be deemed harmless if it is

unimportant in relation to everything else the jury considered, <u>Cameron</u> v. <u>City of New York</u>, 598 F.3d 50, 61 (2d Cir. 2010);   "the most critical factor," in determining harmlessness is "the strength of the government's case." <u>McCallum</u>, 584 F.3d at 478. Given the weakness of the Government's case against Barrett, this Court cannot be reasonably assured that the jury's judgement was not substantially swayed by the erroneous admission of the video.

In conclusion, the video demonstrated that Barrett and the others were capable of making a video about a robbery, and nothing more.  It was highly prejudicial, not relevant to any disputed fact, and its admission violated Barrett's First Amendment rights. By admitting it, the District Court committed reversible error.

Point III

THE DISTRICT COURT ERRED IN
RULING THAT A CONSECUTIVE
SENTENCE WITH A MANDATORY
MINIMUM WAS REQUIRED, WHEN
THE PLAIN LANGUAGE OF 18 U.S.C. §§
924(j) AND 924(c) INDICATES
CLEARLY THAT NO SUCH
REQUIREMENT EXISTS.

Despite the straight-forward, unambiguous language of 18 U.S.C. §§924(j)
and 924(c), which authorized the District Court to consider a wide range of
punishments for Barrett's §924(j) conviction, the lower court, relying on the
summary order in United States v. Young, 561 Fed. Appx. 85 (2d Cir. 2012), ruled
that it lacked the discretion to sentence Barrett to anything other than a consecutive
sentence with a mandatory minimum term. This error resulted in a 90-year
sentence that this Court should vacate.

This Court reviews defendants' sentences for "reasonableness," "a
particularly deferential form of abuse-of-discretion review," both with regard to the
procedural aspects of sentencing and the substantive length of the sentence. United
States v. Cavera, 550 F.3d 180, 188 & n. 5 (2d Cir.2008) (en banc); accord United
States v. Broxmeyer, 699 F.3d 265, 278 (2d Cir.2012). In reviewing for procedural
reasonableness, this Court reviews de novo challenges to the District Court's

statutory interpretation. See <u>United States</u> v. <u>Cassesse</u>, 685 F.3d 186, 188 (2d Cir.2012).

The District Court had the discretion to impose a concurrent sentence with no mandatory minimum based on the plain language of the statutes in question. There is no dispute that a mandatory consecutive sentence is provided for the offense that is created by §924(c). The language that requires a consecutive sentence for violation of §924(c) states:

> [N]o term of imprisonment imposed on a person <u>under this subsection</u> shall run concurrently with any other term of imprisonment imposed on the person." <u>Id</u>. § 924(c)(1)(D)(ii) [emphasis added].

Similarly, §924( c)(1)(D)(ii) creates a mandatory prison term for a second or subsequent conviction of "<u>this subsection.</u>" There can be no doubt that the "subsection" referred to is §924(c).

The subsection under which Barrett was sentenced - § 924(j) - is a separate subsection from §924(c). It does not reference the penalty provisions of the latter. Section 924(j)'s lack of any such reference to §924(c), in combination with the specific limiting language of §924(c), which explicitly restricts the mandatory, consecutive prison term that it authorizes to violations of "this subsection," makes

it perfectly clear that §924(j) does not incorporate the earlier penalty subsections by reference.   "[T]he starting point for interpreting a statute is the language of the statute itself." United States v. Piervinanzi, 23 F.3d 670, 677 (2d Cir. 1994), quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 108 (1980).  There is nothing imprecise about the language of these statutes, thus their relationship is clear.

Importantly, when the words of a statute are unambiguous, as they are here, there is no need for further judicial interpretation. Rubin v. United States, 449 U.S. 424, 430 (1981).  In such cases, interpreting a statute based on speculation as to the intent of its drafters or its probable results is wholly inappropriate.   Thus, this Court should reject the summary order of Young, which based its ruling largely on the fact that a contrary interpretation would lead to the "unlikely" result that a less harsh penalty could flow from a violation of §924(j) – a crime in which an individual was killed - than from a violation of §924(c).  See also United States v. Berrios, 676 F.3d 118, 140-141 (3d Cir. 2012) ("it is highly unlikely that Congress, which clearly intended to impose additional cumulative punishments for using firearms during violent crimes in cases where no murder occurs, would . . . not intend to impose cumulative punishments in cases where there are actual murder victims"); United States v. Allen, 247 F.3d 741, 746 (8th Cir. 2001) (same).  It is

40

abundantly clear that had Congress intended the punishments of §924(j), the death penalty and life imprisonment, to incorporate the concurrent and mandatory minimum sentencing language of §924(c) they would have stated their intention explicitly. This Court should not hypothesize as to the drafters' intentions when no such speculation is necessary or warranted.

Furthermore, <u>Young</u> recognized, correctly, that §924(j) created a separate offense - murder or manslaughter caused by the use of a firearm in the course of a violation of §924(c) - and did not simply establish a different sentencing factor within the same offense. Similarly, in <u>United States</u> v. <u>Castillo</u>, 530 U.S. 120, 126 (2000), the Supreme Court held that a considerable increase in the applicable sentence for the use of a machinegun suggested that Congress considered the provisions about use of a machinegun to define a separate offense and not a special subset of violations of section §924(c). As a separate offense, §924(j) cannot be interpreted as an additional aggravating punishment for the scheme already set out in §924(c) such that the remainder of that subsection would be incorporated into it. See <u>United States</u> v. <u>Julian</u>, 633 F.3d 1250, 1253 (11th Cir.2011) (concluding that the statutes' plain language establishes §924(j) as a separate offense not subject to §924(c)'s penalty enhancements).

In addition, as the Eleventh Circuit reasoned in <u>Julian</u>, to read §924(j) as mandating a consecutive sentence and mandatory minimum would render superfluous §924(c)(5), which authorizes the death penalty and life imprisonment for homicide caused by armor-piercing bullets. Unlike §924(j), that penalty is enumerated as a part of §924(c), not in a stand-alone section. Because any crime in which death results from the use of armor-piercing ammunition pursuant to §924(c)(5)(B) is also a crime that "causes the death of a person through the use of a firearm," pursuant to §924(j), §924(c)(5) would be merely surplus language if no difference existed between the sentences that these two provisions prescribe. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." <u>TRW Inc.</u> v. <u>Andrews</u>, 54 U.S. 19, 31 (2001). Thus, Barrett's interpretation gives meaning to both §924(j) and § 924(c)(5). Therefore, unlike section §924(c)(5), which imposes a "term of imprisonment . . . under [§924(c)]," and <u>is</u> subject to the prohibition on concurrent sentences stated in §(c)(1)(D)(ii), sentences imposed under §924(j) may be concurrent. <u>United States</u> v. <u>Julian</u>, 633 F.3d at 1255–56.

In the alternative, should this Court finds the relationship between the two provisions unclear, any ambiguity must be resolved in favor of the defendant based

on the rule of lenity. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them; "[t]his venerable rule not only vindicates the fundamental principle that no citizen should be . . . subjected to punishment that is not clearly prescribed. It also . . . keeps courts from making criminal law in Congress's stead." United States v. Santos, 553 U.S. 507, 514 (2008).

\* \* \*

Barrett's due process rights were violated when, less than one year after co-defendant Dore was sentenced to a concurrent term under §924(j), the District Court ruled, with some obvious discomfort, that it no longer had the discretion to impose a concurrent sentence on Barrett. The injustice of the sentencing disparity was exacerbated by the fact that Barrett was far less involved in the robbery that had led to homicide than was Dore. The lower court noted it was "not irrational" to say that Dore, who pointed the trigger, was more culpable than Barrett. Likewise, it is irrational for Barrett to receive a consecutive 25-year sentence for less culpable conduct than his co-defendant who received concurrent time. The result of the sentence disparity in this case is untenable; this Court should not tolerate such a blatantly unfair and arbitrary result.

43

Due process requires proportionality between defendants who are similarly situated. As such, the goal of reducing sentencing disparities among defendants who have been found guilty of similar conduct is a foremost goal of the Sentencing Guidelines. 18 U.S.C. 3553(a). In United States v. Dorsey 132 S.Ct. 2321, 2332 (2012), which held that the Fair Sentencing Act, which reduced the crack to powder cocaine disparity, applied to offenders whose crimes preceded the effective date of the Act but were sentenced afterwards, the Supreme Court reached its result after finding significant differences in the sentences that would have been imposed before and after the Fair Sentencing Act (FSA) without such a ruling. The Supreme Court found those disparities unsupportable. Similarly, the disparity between the application of §924(j) in Dore's and Barrett's sentences cannot be reasonably justified. Finally, just as the Constitution's Ex Post Facto Clause, Art. I, § 9, cl. 3, prohibits applying a new statute's higher penalties to pre-statute conduct, the District Court's new interpretation of §§924(c) and 924(j) should not be applied retroactively to enhance Barrett's sentence.

Alternatively, Barrett respectfully requests that this Court remand this case to the District Court to remedy this unfair sentencing result by using its authority under the parsimony provision of 18 U.S.C. §3553(a). Barrett had received pitiably few opportunities in his life: as a child with learning disabilities, he was

44

largely abandoned to the streets of Mount Vernon, New York, where he became addicted to marijuana and involved with neighborhood boys and criminal activity. The District Court has discretion to reduce the sentences on Counts 1, 3, and 5, for which there is, indisputably, no statutory minimum. The 90-year sentence is harsh and unnecessary, and should be reduced in the interest of justice.

For all of these reasons, Barrett's sentence should be vacated and the case remanded to the District Court for resentencing.

Point IV

BARRETT JOINS THE ARGUMENTS OF
HIS CO-APPELLANT TO THE EXTENT
THEY ARE CONSISTENT WITH THE
ARGUMENTS RAISED HEREIN AND
ARE BENEFICIAL TO HIM.

Pursuant to Rule 28(i), Federal Rules of Appellate Procedure, Barrett joins

in and adopts all other applicable arguments regarding this case that have been or

will be raised by his co-defendant, to the extent that such arguments benefit him

and are not inconsistent with the arguments raised herein.

CONCLUSION

For the reasons stated in Points I and II, this Court should vacate the conviction and remand the case to the District Court, and for the reasons stated in Point III, the case should be remanded to the District Court for resentencing.

Respectfully submitted,

s/_____
    KELLEY SHARKEY

KELLEY SHARKEY, ESQ.
Attorney for Defendant-Appellant
        Dwayne Barrett
26 Court Street - Suite 2805
Brooklyn, New York 11242
(718)858-8843

47

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,943 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.


Respectfully submitted,


s/_____
  KELLEY SHARKEY

KELLEY SHARKEY, ESQ.
Attorney for Defendant-Appellant
    Dwayne Barrett
26 Court Street - Suite 2805
Brooklyn, New York 11242
(718)858-8843

48